UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DIGJAM LIMITED,                                     :

                                                    :       09 Civ. 1607 (AKH) (DF)

                                                    :

                     Plaintiff,                     :

                                                    :

             v.                                     :

                                                    :

WL ROSS & CO. LLC,                                  :

                                                    :

                     Defendant.                     :
-------------------------------------------------------x

## DECLARATION OF RANJEET NABHA IN
## SUPPORT OF DEFENDANT'S MOTION TO DISMISS
## THE COMPLAINT ON *FORUM NON CONVENIENS* GROUNDS

Ranjeet Nabha declares under the penalty of perjury under the laws of the United

States of America that the following is true and correct:

1.      I am the Managing Director of India of WL Ross & Co. LLC ("WLR")

and a director in WL Ross (India) Private Limited.  I submit this affidavit in support of

WLR's motion, on *forum non conveniens* grounds, to dismiss plaintiff Digjam Limited's

("Digjam") Complaint (the "Complaint").

2.      I understand that the Plaintiff was earlier named Birla VXL Limited. Birla

VXL Limited changed its name to Digjam Limited in 2008. Digjam's Complaint is

premised on conduct that occurred almost entirely in India, involving the purchase of the

OCM division of Digjam, which OCM division was spun off into a separate company

named OCM India Limited ("OIL"), and certain real property located within the OCM

facilities in Amritsar, India (the "Amritsar Property") on behalf of a local Indian financial

institution and two Mauritius-based investment funds – India Asset Recovery Fund

Limited and WLR Recovery III (India) Limited (these three entities collectively are referred to herein as the "Funds"). Digjam also asserts claims that certain former Digjam employees who worked (and continue to work) in India provided confidential information to WLR and breached their fiduciary duties owed to Digjam in order to assist WLR in securing the winning bid for these assets on behalf of these entities.

3.    However, after filing suits against two of these employees in an Indian court, claiming that they breached their fiduciary duties owed to Digjam, Digjam subsequently dismissed and released its claims against all of these employees in India, as well as any and all claims it had against WLR.

**The Underlying Transactions Occurred Pursuant To A Restructuring Plan That Was Approved By An Indian Court**

4.    In 2005, Digjam entered into a proposed "Scheme of Arrangement" ("SOA") in India with, among others, Asset Reconstruction Company (India) Limited ("ARCIL"), an Indian company that is owned in large part by various Indian state-run banks, and its other Indian lenders, for the purpose of restructuring Digjam's business and paying down Digjam's debt.  A true and correct copy of the SOA is attached hereto as Exhibit 1.  The SOA was approved on or about February 23, 2006 by an Indian court. A true and correct copy of the approval of the SOA by the High Court of Punjab and Haryana is attached hereto as Exhibit 2.

5.    Under the SOA, a committee was formed, consisting of Digjam's Indian lenders (the "Monitoring Committee"), and that Committee was authorized under the SOA to approve the terms and conditions of any sale of OIL.

**ARCIL Invited Offers To Purchase OIL In India**

6.      On March 13, 2006, ARCIL sent a letter to WLR in Mumbai, India, via a local Indian financial institution, inviting WLR to participate in the bidding process. A true and correct copy of ARCIL's invitation to WLR in India is attached hereto as Exhibit 3. The March 13, 2006 invitation also laid out the process for conducting the bid and stated that ARCIL reserved "the right to conduct the sale process in a manner deemed fit. . . ." Ex. 3 at ¶ 6. ARCIL's March 13, 2006 invitation also provided that "[d]isputes, if any, shall be subject to jurisdiction of Mumbai Courts/Tribunals only." Ex. 3 at ¶ 16.

7.      WLR is a fund manager for various global investment vehicles that focus on distressed securities and business restructuring. As a fund manager, WLR is active in searching for and negotiating potential transactions for the funds under its management. In terms of the OIL transaction, WLR was negotiating with ARCIL on behalf of the Funds. The Funds, rather than WLR, actually purchased OIL and the Amritsar Property.

**The Negotiations and Diligence For This Transaction Occurred Primarily In India**

8.      Along with Yashodhan Sathe, who was based out of Mumbai, India, I acted as one of WLR's primary contacts in the discussions with ARCIL. Prior to submitting WLR's initial bid, I traveled to India to, among other things, view OIL's facilities in Amritsar, India. On approximately March 23, 2006, WLR submitted its initial bid to purchase OIL on behalf of the Funds. Thereafter, WLR conducted due diligence on the transaction. Unlike typical present-day deals, an electronic data room was not set up. Rather, a physical document room was established at the OIL facilities in Amritsar, India. Bidders, including WLR, therefore had to travel to India to perform due diligence. In addition to WLR's legal and accounting advisors, Joe Gorga, Jeff Peck,

3

Tamsen Murray and Mike Lane from International Textile Group ("ITG"), a separate portfolio company owned by funds managed by WLR, also traveled to India during the due diligence process.

9.     During the negotiations that occurred in the months following WLR's initial bid, I had several face-to-face meetings with representatives from ARCIL. Those negotiation meetings took place in Mumbai, India. I also had some face-to-face meetings with employees from Digjam/OIL. All meetings took place in India. In fact, I spent substantial time in India between April of 2006 and March of 2007. During that time, I was heavily involved in setting up WL Ross' $300 million private equity India fund, as well as building out WL Ross' Indian offices and infrastructure.

10.     During the course of the negotiations, it became clear to WLR that the Amritsar Property was a necessary component of the OIL facilities. The Amritsar Property was within the OIL facilities and consisted of certain amenities for employees (for instance employee residential quarters and a club house with recreational facilities for the employees), as well as a warehouse for OIL and two guest houses for senior employees of OIL and customers of OIL. Because of its importance, we informed ARCIL that we did not intend to purchase the OIL facilities unless the Amritsar Property was included in the deal. ARCIL, of course, was free to disregard our request and negotiate with a different potential purchaser. Ultimately, the parties agreed on a total purchase price, for both the OIL facilities and the Amritsar Property, of $37 million. As stated above, it was necessary that the finalized deal be approved by the Monitoring Committee. The bid was approved in India by the Monitoring Committee on September 19, 2006, and in India by Digjam's Board of Directors on September 29, 2006.

**The Assets Were Purchased By Non-U.S. Based Funds, And The Transaction Documents Were Signed And Executed In India**

11.     On September 29, 2006, the Agreement For Sale (the "Agreement") was entered into in India between Digjam, ARCIL, WLR, and OIL.  A true and correct copy of the Agreement is attached hereto as Exhibit 4.  The Agreement is governed under Indian law.  Exhibit 4, ¶ 10.1.  Although the Agreement defined WLR as the "Purchaser," as explained above, WLR itself did not "purchase" these assets.  Rather, as noted above, WLR negotiated the purchase on behalf of the Funds.

12.     The Agreement made clear that the "Purchaser" included WLR's "successors, nominees, affiliates, designees and affiliates."  Soon after the Agreement was executed, it was amended, on February 22, 2007, to make clear that the Funds were the actual purchasers.  A true and correct copy of WLR's February 22, 2007 letter to Digjam, ARCIL, and OIL is attached hereto as Exhibit 5.

13.     In addition to the Agreement, Plaintiff and WLR entered into two separate agreements concerning the Amritsar Property.  On December 15, 2006, Digjam and WLR executed an agreement for the sale of the Amritsar Property.  That agreement was executed in Mumbai, India.  Additionally, on February 22, 2007, Digjam, OIL, and ARCIL entered into a Sale Deed, transferring the Amritsar Property to OIL, as WLR's designee.  The Sale Deed was executed in India as well.  The Monitoring Committee approved the sale of the Amritsar Property.  This approval occurred in India.  True and correct copies of the December 15, 2006 and February 22, 2007 agreements are attached hereto as Exhibits 6 and 7, respectively.

**The Employees That Purportedly Breached Their Duties To Digjam Are Employed In India**

14.     In its Complaint, Digjam asserts that WLR employees, including myself, gained confidential information from, among others, Rajiv Surana ("Surana"), Sukhwinder Singh ("Singh") and Sarvjit Maheshwari ("Maheshwari") (the "Employees"). All of these Employees worked in India and continue to work and live in India today.

15.     After the Employees resigned from Digjam, Digjam filed lawsuits in India against Singh and Maheshwari, claiming that they had breached their duties owed to Plaintiff, and seeking injunctions prohibiting them from working for a "rival organization." True and correct copies of the complaints filed in these actions are attached hereto as Exhibits 8 and 9. Digjam also sent a letter to WLR in November of 2006, claiming that it had improperly contacted Plaintiff's employees during the negotiations. A true and correct copy of Digjam's November 11, 2006 letter to WLR is attached hereto as Exhibit 10.

16.     The Complaint references a meeting on November 30, 2006, between me and representatives from Digjam and ARCIL. That meeting occurred in India. At that meeting, I informed Digjam that WLR believed that the lawsuits it had filed against the Employees should be dropped prior to closing of the transaction.

17.     On December 15, 2006, Digjam, following negotiations in India between itself, ARCIL, and WLR, released all claims against the Employees. Digjam also released WLR on December 15, 2006, agreeing that it "shall have no claims and hold harmless the signatories, its personnel or related entities under the Agreement for Sale

dated September 29, 2006." A true and correct copy of Digjam's December 15, 2006 letter to WLR is attached hereto as Exhibit 11. The sale of OIL to the Funds closed in India on February 22, 2007, and, that same day, Digjam withdrew the lawsuits it filed in India against Mr. Singh and Mr. Maheshwari. The Employees currently work for OIL in India.

18.    To the extent that jurisdiction does not exist already in connection with the allegations asserted in the Complaint, WLR will consent to jurisdiction in the appropriate court in India.

Dated: April 15, 2009
      Mumbai, India

Ranjeet Nabha